**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


UNITED STATES OF AMERICA,

      Plaintiff,

v.                                  Case No. 15-CR-1889 JCH


RAYMOND MOYA,

      Defendant.


**MOTION FOR PROTECTIVE ORDER TO BAR EXTRAJUDICIAL**
**STATEMENTS, DISCLOSURES AND**
**<u>INFORMATION BY THE PARTIES IN THIS CASE</u>**

      Raymond Moya, by and through co-counsel of record Amy Sirignano, Esq., of the Law Office of Amy Sirignano, PC, and JD Herrera, of the Law Offices of JD Herrera, hereby moves this Court for a protective order precluding any extrajudicial statements and disclosures in the above-listed case by the parties in this case, and by law enforcement.  As grounds, counsel states:

**<u>INTRODUCTORY ISSUES</u>**

    1.  The federal case against the defendant has already been so highly publicized, hyperbolized, and sensationalized in the New Mexico media that the defendant will continue to suffer irreparable prejudice, resulting in an unfair trial on these charges due to the intense media focus.

    2.  Immediately following the filing of the Indictment in this case and the Indictment against Joseph Dyson, the Albuquerque Journal and other New Mexico media outlets flooded the public with highly prejudicial and damaging articles, making statements that endanger defendant's constitutional right to receive a fair trial by an *impartial* jury.  As detailed below, the government and law enforcement officials have used the media to publicize statements that present a clear and present danger of prejudicing the proceedings against the Defendant.

    3.  Defendant is concerned that attorneys for the government and law enforcement are speaking to the press to heighten public condemnation of Defendant and influence the outcome of his trial.  In their reporting, the media has demonized Defendant and drawn frightening characterizations of him.  There has been constant news

coverage on the front page of the Albuquerque Journal and features on local television news stations and on social media. The prosecution's office and law enforcement have released a steady stream of statements announcing the prosecution and conviction of cases similar to Defendant's, negatively impacting the public's view of the Defendant's case.  The total effect of the government's publicity is that the public has been continuously and vigorously inundated with negative, prejudicial, and inaccurate media coverage of Defendant's case.

4.   In 1941, the United States Supreme Court recognized that "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."  *Bridges v. California*, 314 U.S. 252, 271 (1941).

5.   Defense counsel is concerned that some individual(s) and/or entit(ies) in law enforcement and the U.S. Attorney's Office, have and will continue to leak information to the press in potential violation of Fed. R. Crim. P. 6(e)(2)(B),[1] 28 C.F.R. § 50.2(b)(2) (Guidelines regarding release of information by personnel of the Department of Justice relating to criminal and civil proceedings)[2], and the New Mexico Rules of Professional Conduct. *See* N.M. R. PROF. CONDUCT, Rule 16-306.

6.   Defendant requests that this Court take action to protect his constitutional right to a fair and impartial jury trial.  In order to prevent the further tainting of the statewide jury pool, Defendant respectfully requests that this Court impose an immediate Protective Order barring extrajudicial statements, disclosures, or further information by the parties in Mr. Moya's case to the media.  This Order should also prohibit further statements on Defendant's case from the U.S. Attorney's Office and law enforcement.

---

1 Fed. R. Crim. Proc. 6(e)(2), provides the rules of Grand Jury Secrecy.  The statute imposes a duty "not disclose a matter occurring before the grand jury" on individuals involved in the grand jury process, including "a grand juror; an interpreter; a court reporter; an operator of a recording device; a person who transcribes recorded testimony; *an attorney for the government*; or a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii)."  Fed. R. Crim. Proc. 6(e)(2)(B) (i)-(vii)(emphasis added).

2 28 C.F.R. § 50.2(b)(2) provides, in pertinent part, "[a]t no time shall personnel of the Department of Justice furnish any statement or information for the purpose of influencing the outcome of a defendant's trial, nor shall personnel of the Department furnish any statement or information, which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial."  *See also* U.S. Attorney's Manual, Title I, Chapter 1-7.111, Need for Confidentiality (stating importance of confidentiality in "on-going operations and investigations. . . ." *available at* http://www.justice.gov/usao/eousa/ foia_reading_room/usam/title1/7mdoj.htm#1-7.111.

## TIMELINE OF EVENTS AND RELATED NEWS COVERAGE

### DECEMBER 2012

7.   On December 29, 2012, the Albuquerque Journal published an article titled "Man Charged in Death of Activist's Son." The article states that in August 2011, Jennifer Weiss, an anti-heroin activist, found her 18-year-old son unconscious in his bedroom. According to the article, after attempts to revive Cameron Weiss failed, the former La Cueva athlete died of a heroin overdose. The article states federal prosecutors charged a man with providing the heroin that killed Cameron Weiss. The article states Joseph Dyson was charged in federal court with "distribution of heroin with death resulting," and distributing to a person under 21. The DEA filed the criminal complaint against Dyson, which was unsealed December 26, 2012. The article states Dyson appeared before U.S. Magistrate Judge Robert Scott and waived a detention hearing and remains in custody of the U.S. Marshal Service.

8.   The article goes on to state Ms. Weiss became an advocate for raising awareness about heroin use when Cameron revealed his addiction in 2010. The article states the investigation in Cameron Weiss' death found he acquired heroin from a man known as "Joe." The article continues by stating Weiss injected three times in the presence of a person, identified as a confidential source, on the evening of his death. The article states Dyson was identified by photo lineup of six individuals. "The DEA source also said the only heroin Weiss had received was from Dyson." The article states Department of Corrections online records show Dyson was on probation at from a recovery unit in Los Lunas after his release on four prior convictions for possessing a controlled substance. The article state Jennifer Weiss founded the Heroin Awareness Committee in 2010, which pushes for more drug addiction programs. The article states that according to Mr. Weiss, Cameron had been clean for six months while he was in a drug treatment program but fell back into old habits upon returning to Albuquerque.  Scott Sandlin, *Man Charged in Death of Activist's Son*, Albuquerque Journal, Dec. 12, 2012, available at https://www.abqjournal.com/156430/man-charged-in-death-of-activists-son.html?utm_source=abqjournal.com&utm_medium=related+posts+-+crime&utm_campaign=related+posts. *See* Exhibit A.

**FEBRUARY 2014**

9.   On February 15, 2014, the Albuquerque Journal published an article titled "Heroin scourge cuts across cultural and economic barriers." The article states, with the death of actor Philip Seymour Hoffman, that heroin addicts do not look like the stereotype "gaunt, gangster, slovenly, sick" image, but can be people such as neighbors, co-workers and friends. The article states one heroin addict was Cameron Weiss, "an 18-year-old poet from a good family and a football player and wrestler for La Cueva High School." The article includes a photo of Cameron smiling. The article goes on to state Cameron's addiction began with prescriptions for narcotic painkillers to treat various sports injuries, which ran out, and he turned to heroin—an easier and cheaper option than OxyContin or Vicodin. The article states Cameron's first experience with heroin was in August 2009 and last came in August 2011. Cameron's mother found him dead in his bedroom after he returned from rehabilitation in a five-month out-of-state care program and jail. Ms. Weiss states, "[w]e like to think of addicts as the homeless, as prostitutes, not someone like us . . . What we see in New Mexico is that you can't segment heroin use to certain parts of town. Addicts are in all schools, all parts of Albuquerque from the Far Northeast Heights to the West Side. It is everywhere. You want to see what a heroin user looks like? Hold up a mirror."  The article states New Mexico has the highest rate of heroin and prescription-drug overdose deaths in the country, according to the Center for Disease Control and Prevention. The article states heroin overdoses jumped 55 percent between 2007 and 2012. Ms. Weiss-Burke founded the Heroin Awareness Committee, now the Healing Addiction in our Community (HAC), after Cameron admitted to being an addict in February 2010. Ms. Weiss-Burke and members of her organization are trying to persuade the New Mexico Legislature to commit money to a transition living center for recovering addicts. The article states New Mexico has short-term treatment facilities but no long term transitional living center, which, according to Ms. Weiss-Burke, is why Cameron was sent to Tucson for a five-month program. Ms. Weiss-Burke states her frustration with the treatment system being too short, which often releases people after 20 days. The article concludes with Ms. Weiss-Burke stating "[i]t's really unfortunate that someone has to die in order for the issue of heroin addiction to come to the surface again, but that's just the way our society works . . . Something tragic has to happen before change happens. Unfortunately, when it comes to heroin, that tragedy happens all the time. It just doesn't

make the news." Joline Gutierrez Krueger, *Heroin scourge cuts across cultural and economic barriers*, Albuquerque Journal, Feb. 15, 2014, available at https://www.abqjournal.com/353525/heroin-use-is-up-nearly-80-percent.html?utm_source=abqjournal.com&utm_medium=related+posts+-+crime&utm_campaign=related+posts. *See* Exhibit B.

### OCTOBER 2014

10. On October 8, 2014, the United States Attorney's Office District of New Mexico issued a press release titled "Albuquerque Man Sentenced to Seventy-Two Months for Heroin Trafficking Conviction." The press release states Raymond Moya of Albuquerque was sentenced to ten years in federal prison for trafficking heroin. The press release states Moya was charged in November 2011 for possession of heroin with intent to distribute and later indicted on that charge in December 2011. The press release states that according to court filings, Moya was arrested pursuant to outstanding state warrants by APD on November 4, 2011. The press release goes on to state Moya entered a guilty plea to the indictment and admitted to possessing approximately 50 grams of heroin. The press release states Moya had been convicted of previous felony offenses including possession of a controlled substance, aggravated assault with a deadly weapon, and possession of a controlled substance with intent to distribute. The press release states the DEA Albuquerque office investigated the case alongside the U.S. Marshals Service, and the Albuquerque Police Department with the assistance of the Second Judicial District Attorney's Office. The press release states Assistant U.S. Attorneys Sean J. Sullivan and Nicholas J. Ganjei prosecuted the case as part of the federal anti-violence initiative that targets "the worst of the worst" offenders for federal prosecution. The press release states the initiative combines the efforts of the U.S. Attorney's Office and federal law enforcement agencies and works with New Mexico's District Attorneys and state, local and tribal law enforcement agencies, targeting violent and repeat offenders for federal prosecution and seeks to remove the offender from New Mexico communities for as long as possible. *Albuquerque Man Sentenced to Seventy-Two Months for Heroin Trafficking Conviction*, United States Department of Justice, *available at* https://www.justice.gov/usao-nm/pr/albuquerque-man-sentenced-seventy-two-months-heroin-trafficking-conviction. *See* Exhibit C.

5

**APRIL – SEPTMEBER 2016**

11. On April 21, 2016, April 25, 2016, April 27, 2016, April 29, 2016, May 4, 2016, May 9, 2016, May 13, 2016, May 18, 2016, May 26, 2016, May 27, 2016, June 7, 2016 (three press releases), June 8, 2016, June 14, 2016, June 20, 2016, June 21, 2016, June 24, 2016, June 30, 2016 (two press releases), July 12, 2016 (two press releases), July 13, 2016, July 14, 2016 (two press releases), July 15, 2016, (two press releases), July 26, 2016, August 1, 2016, August 4, 2016, August 9, 2016, August 18, 2016, August 23, 2016, September 1, 2016, September 8, 2016, and September 16, 2016, the United States Attorney's Office District of New Mexico issued press releases regarding other defendants that were prosecuted under the federal "worst of the worst" Anti-Violence Initiative and Mexico Heroin and Opioid Prevention and Education (HOPE) Initiative for charges of heroin trafficking and firearms.  The press releases generally state that the High Intensity Drug Trafficking Area (HIDTA) Program is a White House Office National Drug Control Policy (ONDCP) program that aids cooperation between federal, state, local and tribal law enforcement agencies to encourage sharing of intelligence and support operations aimed at dismantling drug trafficking organizations in critical drug trafficking regions of the United States.  The releases also generally state, that the New HOPE Initiative, and the federal anti-violence initiative, targets "the worst of the worst" offenders for federal prosecution. The HOPE Initiative launched in January 2015 by the UNM Health Sciences Center and the U.S. Attorney's Office as a response to the national opioid epidemic, which has disproportionately devastating impact on New Mexico.

12. The press releases go on to explain the HOPE Initiative has a working partnership between the DEA, Bernalillo County Opioid Accountability Initiative, Healing Addiction in our Community (HAC) and other community stakeholders. HOPE's principal goals are to protect New Mexico communities from heroin and opioid painkillers dangers and the dangers associated with such drugs as well as reducing the number of opioid related deaths in state. The press release explains the HOPE Initiative is comprised of five components: "(1) prevention and education; (2) treatment; (3) law enforcement; (4) reentry; and (5) strategic planning." The law enforcement component of the HOPE Initiative is led by the Organized Crime Section of the U.S. Attorney's Office and the DEA along with their federal, state, local and tribal law enforcement partners. The press releases

state the HOPE Initiative's priority is to target members of major heroin and opioid trafficking organizations for investigations and prosecution. The press release explains federal anti-violence "the worst of the worst" initiative allows the U.S. Attorney's Office and federal law enforcement agencies to work with state, local and tribal law enforcement agencies along with New Mexico's District Attorney's Office to target repeat offenders, based on prior convictions, for federal prosecution to remove repeat offenders from counties with the highest violence crime rates for as long as possible.

13. Also on April 29, 2016, the United States Attorney's Office District of New Mexico released a media advisory statement titled "New Mexico HOPE Initiative Partners to Discuss Impact of DEA's National Take Back Initiative on New Mexico's Opioid Epidemic." The media advisory states U.S. Attorney Damon P. Martinez, Bernalillo County Commissioner Maggie Hart Stebbins, City Councilor Diane Gibson, and Ryan P. Cangiolosi, Chief Strategic Advisor for UNM's Health Sciences Center and DEA Assistant Special Agent in Charge Sean R. Waite presented at the DEA Drug Take Back collection site in Albuquerque on April 30, 2016, to discuss the impact of the DEA's National Take Back Initiative on New Mexico's opioid epidemic. "This media opportunity is part of the prevention and education component of the New Mexico Heroin and Opioid Prevention and Education (HOPE) Initiative." The press release follows previous press statements and explains the components and goals of the HOPE Initiative along with participating parties in the partnership. *New Mexico HOPE Initiative Partners to Discuss Impact of DEA's National Take Back Initiative on New Mexico's Opioid Epidemic*, United States Department of Justice, *available at* https://www.justice.gov/usao-nm/pr/media-advisory-new-mexico-hope-initiative-partners-discuss-impact-dea-s-national-take. *See* Exhibit D.

14. On May 31, 2016, the United States Attorney's Office District of New Mexico issued a media advisory statement titled "U.S. Attorney Damon P. Martinez to Address Rotary Club of Rio Rancho Sunrise." The press release states U.S. Attorney Damon P. Martinez will present to the Rotary Club of Rio Rancho Sunrise on the violent crime crisis and the heroin and prescription opioid epidemic confronting New Mexico. *U.S. Attorney Damon P. Martinez to Address Rotary Club of Rio Rancho Sunrise*, United States Department of Justice, *available at* https://www.justice.gov/usao-nm/pr/media-advisory-us-attorney-damon-p-martinez-address-rotary-

club-rio-rancho-sunrise. *See* Exhibit E.

15. On June 1, 2016, the United States Attorney's Office District of New Mexico issued a media advisory statement titled "New Mexico HOPE Initiative Partners to Meet the Silver Barelas Downtown Neighborhood Association." The media advisory states U.S. Attorney Damon P. Martinez and Dr. Cristina V. Beato, Executive Director for Health Policy and International Medicine, UNM Health Sciences Center, would be participants in a June 2, 2016, meeting with the Silver Barelas Downtown Neighborhood Association. According to the media advisory, the meeting is part of the prevention and education efforts of the New Mexico Heroin and Opioid Prevention and Education (HOPE) Initiative. Other representatives attending the meeting included U.S. Attorney's Office, Drug Enforcement Administration and UNM College of Pharmacy-Generation Rx. The press release explains the HOPE Initiative was launched in January 2015 by the UNM Health Sciences Center and the U.S. Attorney's Office as a response to the heroin and opioid epidemic which has disproportionately impacted New Mexico. The press release includes a HOPE Initiative poster that includes information about the HOPE Initiative website and the community outreach event information. *New Mexico HOPE Initiative Partners to Meet the Silver Barelas Downtown Neighborhood Association*, United States Department of Justice, *available at* https://www.justice.gov/usao-nm/pr/media-advisory-new-mexico-hope-initiative-partners-meet-silver-barelas-downtown. *See* Exhibit F.

16. On June 13, 2016, the United States Attorney's Office District of New Mexico released a media advisory statement for community outreach titled "U.S Attorney Damon Martinez Joins KANW and the Albuquerque Journal for a Special Radio Broadcast on New Mexico's Heroin and Opioid Epidemic." The press release states U.S. Attorney Damon P. Martinez will join KANW General Manager Michael Brasher and Albuquerque Journal Investigative Reporter Mike Gallagher for special broadcast on New Mexico's heroin and opioid epidemic. The press release states that the broadcast will identify issues that will be addressed during the KANW/Albuquerque Journal live public forum on heroin and opioid prevention and education by more than 20 experts. The public forum event is part of the HOPE Initiative and will be co-hosted by U.S. Attorney Martinez and Executive Vice Chancellor Richard Larson, UNM Health Sciences Center. The press release follows previous press statements and explains the components and goals of the HOPE Initiative along with

participating parties in the partnership. *U.S Attorney Damon Martinez Joins KANW and the Albuquerque Journal for a Special Radio Broadcast on New Mexico's Heroin and Opioid Epidemic*, United States Department of Justice, *available at* https://www.justice.gov/usao-nm/pr/media-advisory-us-attorney-damon-martinez-joins-kanw-and-albuquerque-journal-special. *See* Exhibit G.

17. On June 15, 2016, the United States Attorney's Office District of New Mexico issued a press release titled "HOPE Initiative Partners to Co-Host KANW/Albuquerque Journal Public Forum on New Mexico's Heroin and Opioid Epidemic." The press release states the HOPE Initiative Partners, U.S. Attorney Damon P. Martinez and Executive Vice Chancellor Richard Larson, UNM Health Sciences Center, will co-host a public forum on New Mexico's heroin and opioid epidemic presented by KANW/Albuquerque and broadcasted on KANW 98.1 FM on the night of the forum. The press release stated the public forum would be moderated by Albuquerque Journal Editor-in-Chief Kent Walz and Albuquerque Journal Investigative Reporter Mike Gallagher. The forum included more than 20 experts from law enforcement, medical professionals, local government and community organizations to respond to questions from New Mexico residents about the heroin and opioid epidemic. The press release's attached list of experts included Dr. Snehal R. Bhatt of the UNM Psychiatric Center and Medical Director of Addictions and Substance Abuse Programs including Milagro Program, Michelle Brooks of Parent of Young Adults in Recovery and Healing Addiction in our Community (HAC) Volunteer, Michel Disco an Assistant Dean for External Programs at UNM's College of Pharmacy and Faculty Advisor for Generation Rx, Lou Duran a Prevention Specialist/Event Coordinator and HAC, Dr. Dion Gallant a Medical Director for Primary Care Services and Presbyterian Healthcare Services, Diane G. Gibson a Albuquerque City Councilor of District 7, Brittany Haggard a Chairperson of Generation Rx of UNM's College of Pharmacy and HOPE Initiative Prevention & Education Presenter, Maggie Hart Stebbins a Bernalillo County Commissioner of District 3, Shammara H. Henderson a Smart on Crime Assistant U.S. Attorney and HOPE Initiative Prevention & Education Presenter, Katrina Hotrum a Director of Department of Substance Abuse & Treatment Program (DSAP) for Bernalillo County, Dr. Steven Jenkusky a Greater Albuquerque Medical Association (GAMA), Dr. Joanna G. Katzman a Director of UNM's Pain Center, Dr. Christopher Manetta a Medical Director for Behavioral Health of Presbyterian Healthcare Services, Ava McGuire an Addict in

Recovery and Community Advocate, Nicole Perea a former Chairperson of Generation Rx of UNM's College of Pharmacy and HOPE Initiative Prevention & Education Presenter, Lisa Simpson a Bernalillo County Public Safety Division and Technical Advisor on Jail Population Management and Developing Alternatives to Incarceration, Dr. Steven A. Seifert a Professor of UNM School of Medicine and Medical Director of New Mexico Poison Center, Dr. Mauricio Tohen of UNM Health Sciences Center and Chairman of Psychiatry Department, Sean Waite a DEA Assistant Special Agent in Charge, Dr. William Wiese a Co-Chairman of Bernalillo County Opioid Accountability Initiative, Jennifer Weiss-Burke Executive Director of HAC and Serenity Mesa. The public forum expert list included a brief statement about each experts' background. Ms. Weiss-Burke's bio stated that she was a full-time advocate since losing her 18-year-old son, Cameron, to a heroin overdose in 2011, and has since spent her time advocating for change "to break the stigma associated with addiction, fighting for more treatment options for youth, increasing prevention efforts in the schools, and helping the community understand that this epidemic can affect anyone regardless of social status, ethnicity, background, or career path. *HOPE Initiative Partners to Co-Host KANW/Albuquerque Journal Public Forum on New Mexico's Heroin and Opioid Epidemic*, United States Department of Justice, *available at* https://www.justice.gov/usao-nm/pr/media-advisory-hope-initiative-partners-co-host-kanwalbuquerque-journal-public-forum-new. *See* Exhibit H.

18. On July 30, 2016, the Albuquerque Journal published an article titled "Advocates say teen addicts will be left on their own." The article discusses the state's plan to close a teen treatment facility which will leave little choice for teens trying to withdraw from heroin and narcotic painkillers. The article states the Department of Health plans to move forward with facility closure despite some lawmakers wanting to stop the move. The article reports Jennifer Weiss-Burke stating residential treatment facilities cannot offer medical detoxification and cannot accept addicts until they withdraw from opioid drugs. Ms. Weiss-Burke advocated with legislators to not close the facility reiterating none of the other facilities offer detoxification services for teens. Olivier Uyttebrouch, *Advocates say teen addicts will be left on their own*, Albuquerque Journal, July 30, 2016, available at https://www.abqjournal.com/817667/advocates-say-teen-addicts-will-be-left-on-their-own.html. *See* Exhibit I.

19. On August 21, 2016, on the front page of the Albuquerque Journal, an article was published, titled "Heroin dealer faces charge in death of 18-year-old." The article states Cameron Weiss and Raymond Moya intersected briefly on August 12, 2011 in a way "that would end one life and could forever change the other." The article states Weiss was an 18-year-old La Cueva High School wrestler and football player who became addicted to legally prescribed painkillers. Weiss died a day later, after meeting with Moya, and was found by his mother in his bedroom. The article states Moya was former member of the Westside Locos street gang and a prison inmate. The article goes on to state Moya faces a federal trial in the fall for selling heroin that led to Weiss's death and faces a minimum of 20 years and a maximum of life in prison if convicted. The article states "[t]o the best of anyone's knowledge, the lives of Weiss and Moya crossed paths only once – in a Wendy's restaurant parking lot on Coors NW. Witnesses say the two didn't actually meet face to face because an intermediary made the heroin purchase 2 grams for $100." Weiss died less than 24 hours later. The article states heroin prosecutions are up across the country at the state and federal levels, but the charge Moya faces, distribution of heroin resulting in death, is "rare, according to officials." The article states there is only one other case like Moya's in New Mexico federal court and a handful of cases charged around the country in 2016. The article states the purpose of the law is to hold "drug dealers responsible for the damage they cause by selling drugs, but linking an individual overdose to a specific drug deal is difficult." The article explains witnesses are usually drug addicts and in Cameron Weiss' case there are two witnesses, a high school friend and a jailhouse acquaintance. The article continues by stating, in 2012, Joseph Dyson was charged with supplying Cameron Weiss with the heroin that led to Weiss's death. Dyson and Weiss met at the Metropolitan Detention Center in July 2011 when they were both locked up on minor charges. Dyson told prosecutors how he and Weiss obtained the heroin, as part of plea agreement to a lesser heroin distribution charge. The article discusses that Dyson, using his cellphone, arranged to buy heroin to share with Weiss and his friend. On August 12, 2011, Dyson and Weiss drove to Wendy's to buy heroin from Moya, who Dyson said sold to him in the past. The article states Dyson got out of the car and walked to a Cadillac in the parking lot where he met with Moya in the front passenger seat. "I gave approximately $100 to Moya and received approximately two grams of heroin from him," Dyson stated in his federal plea agreement. Dyson said he returned to the car he arrived in where he,

Weiss and his friend heated the heroin and injected the it. The article states the three men split up the rest of the heroin and a day later Dyson found out about Weiss's overdose. The article states Dyson pled guilty to distribution of heroin in federal court but has yet to be sentenced due to his plea agreement tying his testimony against Moya as a requirement before being sentenced. The article states Dyson is locked up because he was unable to abide by the conditions of his release which included not using any drugs. The article goes on to discuss Moya's arrest in November 2011for violating his probation after state convictions for distributing controlled substances. The detectives that arrested Moya found heroin and more than $5,000 in his pockets. The article states, according to court records, Moya said he was selling heroin to raise money for a defense attorney in his pending state felony case. The Albuquerque Police Department gang detectives have known Moya since his teens when he tagged public areas and then became a member of the Westside Locos. The article discusses Moya's prior felony convictions in 2002 and 2004 for possession of controlled substances, and in 2002 for aggravated assault with a deadly weapon. The article states Moya is an admitted heroin addict along with his sister and his father who is a recovering heroin addict, according to court records. The article states five of Moya's childhood friends have died of heroin overdoses and his girlfriend is in drug rehabilitation for heroin addiction, according to court records. The article states, in April 2014, Moya plead guilty to distribution of heroin in federal court and plead guilty to state drug charges. "According to the plea agreement, Moya was aware that federal prosecutors were considering a separate case against him for the sale of heroin resulting in Cameron Weiss's death. U.S. District Judge Martha Vazquez rejected the 10-year sentence over the objections of prosecutors and decided to sentence Moya to seven years in federal prison instead of 10 years. According to the transcript of the court proceedings, Vazquez said she believed Moya's criminal record was not as severe as it might appear on the surface and that he appeared amenable to rehabilitation." The article states Judge Vazquez noted Moya had been in jail for almost three years on state charges, time he would not receive credit for in a federal prison sentence. The article states, Moya is serving federal and state sentences pending his trial in the Cameron Weiss case, which could add minimum of 20 years and a maximum of life in prison, if convicted of distributing heroin resulting in Weiss's death. The article goes on to discuss Jennifer Weiss-Burke, Cameron Weiss's mother, who founded Healing Addiction in our Community in 2010 while Cameron was in a

rehabilitation center outside New Mexico. The article states Cameron Weiss was a "new type of heroin addict," prompting Ms. Weiss-Burke to call for more treatment programs for teen addicts in New Mexico prior to her son's death. The article states Ms. Weiss-Burke did not want to comment on the Moya case. The article includes photos of Moya, Weiss, Dyson and Ms. Weiss-Burke. Mike Gallagher, *Heroin dealer faces charge in death of 18-year-old*, Albuquerque Journal, Aug. 21, 2016, available at https://www.abqjournal.com/830073/heroin-dealer-faces-charge-in-2011-death.html. *See* Exhibit J.

20.     On August 26, 2016, the Albuquerque Journal published an editorial titled "Feds push back against heroin dealers of death." The article states high quality Mexican heroin smuggled into the United States is "wreaking havoc." The article states a coalition of federal and state prosecutors, health officials and addiction recovery advocates are "getting creative in the battle against it. Case in point: The U.S. Attorney's Office in Albuquerque is employing a rarely use law – distribution of heroin resulting in death – to go after a dealer who supplied the deadly drug to an Albuquerque teenager." The article goes on to state federal prosecutors have one of two accused dealers allegedly involved in the death of 18-year-old Cameron Weiss "in their sights." The article states Raymond Moya is charged with supplying Weiss with Mexican black tar heroin in August 2011. The article states Moya faces a minimum of 20 years and a maximum of life in prison if convicted of distribution resulting in death. The article continues by stating Weiss met Joseph Dyson at the Metropolitan Detention Center in July 2011. The article states Dyson bought the heroin from Moya, according to Dyson's account to prosecutors following Weiss' overdose. The article states Dyson, Weiss and a high school friend injected some of the purchased heroin together and the following day Weiss was found dead. The article states Dyson was charged with supplying Weiss with heroin in 2012, but Dyson took a plea deal for a lesser heroin distribution charge in exchange for testifying against Moya. The article states Dyson has not been sentence yet due to the plea agreement. The article states "[t]his rarely used law is another way to make dealers responsible for actions that lead to death." The article states that it can be difficult to link an overdose to a specific drug deal but there are two witness's in Weiss' case – Dyson and his friend. The article concludes the "U.S. Attorney's Office is on the right track in using all the tools available to tackle the heroin crisis. New Mexico needs more of this out-of-the-box thinking if it is to get a handle on this epidemic." Albuquerque Journal Editorial Board, *Feds*

*push back against heroin dealers of death*, Albuquerque Journal, Aug. 26, 2016, available at

https://www.abqjournal.com/833604/feds-push-back-against-heroin-dealers-of-death.html. *See* Exhibit K.

21.   On September 16, 2016, the United States Attorney's Office District of New Mexico issued a press release titled "New Mexico Hope Initiative to Launch Naloxone Project." The press release states U.S. Attorney General Loretta E. Lynch designated the week of September 18, 2016, as National Heroin and Opioid Awareness Week. The press release states U.S. Attorneys throughout the country are sponsoring events intended to increase awareness and develop solutions for the growing epidemic of heroin and opioid abuse in the country. The press release continues by stating the New Mexico Heroin and Opioid Prevention and Education (HOPE) Initiative, a partnership between the UNM Health Services Center and the U.S. Attorney's Office, hosted a series of education events during the national awareness week. The press release states that one of the key components in fighting against addiction and overdose deaths is the availability of the life-saving medications like Naloxone, which reverses the effects of an opioid overdose. The press release states U.S. Attorney Damon P. Martinez and Dr. Joanna G. Katzman, Director of the UNM Pain Clinic, will launch the HOPE Initiative's Naloxone Project during a press conference on September 19, 2016. U.S Attorney and Dr. Katzman will be joined by Bernalillo County Commissioner Maggie Hart Stebbins, Albuquerque City Council President Dan Lewis, Albuquerque City Councilor Diane Gibson, and representatives of law enforcement agencies supporting the carrying of Naloxone. *New Mexico Hope Initiative to Launch Naloxone Project*, United States Department of Justice, *available at* https://www.justice.gov/usao-nm/pr/media-advisory-new-mexico-hope-initiative-launch-naloxone-project. *See* Exhibit L.

22.   On September 16, 2016, the United States Attorney's Office District of New Mexico released a press statement titled "National Heroin and Opioid Awareness Week Set for September 18-24, 2016." The press release states U.S. Attorney General Loretta E Lynch designated the week of September 18, 2016, as National Heroin and Opioid Awareness Week, following President Obama's announcement of a "week of action" to raise awareness of the public health crisis caused by the growing heroin and opioid epidemic. U.S. Attorneys throughout the country are sponsoring events geared towards increasing awareness and developing solutions for the growing epidemic. The national awareness effort is in response to nationwide heroin overdoses have

increased 244 percent between 2007 and 2013. The press release states many new heroin users are youths

averaging 24 ½ years old for first-time users. The press release goes on to state the nationwide daily average for

deaths attributable to opioid related overdoes is 78 people. The HOPE Initiative is in New Mexico participated

in the awareness week events. Associate Deputy Attorney General Bruce G. Ohr stated "[t]he Justice

Department wants to highlight the incredible work that the U.S. Attorney's Office and its HOPE partners are

doing to combat the heroin and opioid epidemic in New Mexico." Paul B. Roth, MD, MS, Chancellor for

Health Sciences at the University of New Mexico stated "This partnership with the U.S. Attorney's Office

presents us with an extraordinary opportunity to help reduce opioid overdose deaths and help alleviate the awful

personal and social costs that accompany drug dependency." U.S. Attorney Damon P. Martinez for the District

of New Mexico stated ""In 2014, New Mexico had the second-highest per capita overdose death rate in the

country.  Our community has acknowledged that we are in an epidemic, and we are coming together to take

control of our future and our destiny . . . Through the HOPE Initiative, we are pursuing a comprehensive

strategy to deal with, and defeat, this epidemic, and we will highlight our efforts in the coming week." *National

Heroin and Opioid Awareness Week Set for September 18-24*, 2016, United States Department of Justice,

*available at* https://www.justice.gov/usao-nm/pr/national-heroin-and-opioid-awareness-week-set-september-18-

24-2016. *See* Exhibit M.

    23. On September 16, 2016, the Albuquerque Journal published an article titled "A variety of addiction

recovery services featured at Civic Plaza." The article states 45 groups that offered a variety of addiction

recovery services along with people struggling with addiction gathered at Civic Plaza for a daylong event called

Albuquerque Celebrates Recovery. The article states Jennifer Weiss-Burke said discussions focused on the

death toll and stories of lives destroyed by drugs. The article states Ms. Weiss-Burke spoke from the Serenity

Mesa booth and said the event showed people struggling with addiction there is hope. Regional director of

Shadow Mountain Recovery, Tim Tokarski also attended the event to field questions from parents and family

members of people struggling with addiction. Olivier Uytterbrouck, *A variety of addiction recovery services

featured at Civic Plaza*, Albuquerque Journal, Sept. 16, 2016, available at

https://www.abqjournal.com/846298/a-variety-of-addiction-recovery-services-featured-at-civic-plaza.html. *See*

Exhibit N.

24.   On September 17, 2016, the Santa Fe New Mexican posted a story titled "Drugmakers fight state opioid limits." The story states the makers of prescription painkillers have country wide strategy stopping or weakening governmental measures aimed at combating the opioid epidemic, which has caused an epidemic of addiction and overdoses. The article states the Associated Press and the Center for Public Integrity found the drugmakers have a playbook employs a delay and defend tactic that includes funding advocacy groups to fight limits on drugs such as OxyContin, Vicodin and fentanyl, the narcotic linked to Prince's death. The article states Jennifer Weiss-Burke, mother of Cameron Weiss, was no match for the drugmakers' industry lobbyists when she fought for a measure in the New Mexico Legislature that she believed would have saved her son's life. The story includes a photo of Ms. Weiss-Burke with the caption Ms. Weiss-Burke is an executive director of a youth recovery center in Albuquerque, and she says "her son's decent into drug addiction started with a painkiller prescription from his doctor and ended with a fatal heroin overdose nearly three years later." The story goes on to state a heroin overdose eventually killed Cameron after "his slippery decent to death started a few years earlier, when a hospital sent him home with a bottle of Percocet after he broke his collarbone in wrestling practice." The story states Ms. Weiss-Burke pushed for a bill that would limit initial prescriptions of opioid painkillers for acute pain to seven days. The opponents, lobbyists for the pharmaceutical industry, fought against the bill by quietly increasing its numbers to stop the measure. Ms. Weiss-Burke states the drug industry lobbyists "were going individually talking to senators and representatives one-on-one" instead of speaking up at legislative hearings. The story states pharmaceutical companies are present in every state capital and poised to fight against any policies that may affect their industry. The story states prescription opioids are synthetic cousins of heroin and morphine and sales for opioids have quadrupled from 1999 to 2010. The pharmaceutical companies and their allies increased their lobbying and campaign contributions lawmakers in New Mexico in 2012 during the period "the bill backed by Cameron Weiss' mother" was stopped. The aim of Ms. Weiss-Burke's bill was to limit the amount of opioids initially prescribed to make addiction less likely and leave few leftover pills that could be sold illegally. The story states Ms. Weiss-Burke's son left the hospital with a bottle of Percocet when he was 16 in 2009. The story also states Ms. Weiss-Burke's son also took pills he found at his

grandparents' house and less than a year later he started smoking heroin, which costs less than illegal prescription drugs. The story state Ms. Weiss-Burke only realized the dangers of prescription pills after her son had moved on to heroin.  Geoff Mulvihill, Liz Essley Whyte & Ben Wieder, *Drugmakers fight state opioid limits*, Santa Fe New Mexican, Sept. 17, 2016, available at

http://www.santafenewmexican.com/news/local_news/drugmakers-fi...s/article_cd5b5540-3d45-5283-a40d-43425c8c579d.html?mode=print. *See* Exhibit O.

25. On September 18, 2016, the Albuquerque Journal published an article titled "School events to focus on addiction." The article states the HOPE Initiative planned a series of educational events as part of the National Heroin and Opioid Awareness Week, which will be attended by law enforcement and health officials. The article states the HOPE Initiative was formed by U.S. Attorney Damon Martinez and New Mexico Health Sciences Center Chancellor Dr. Paul Roth. The article states Martinez and other plan to announce an initiative aimed at increasing the use of naloxone by New Mexico law enforcement agencies., a drug that reverses the effects of a heroin and opioid overdose. The article states that law enforcement and health officials plan to hold confidential listening sessions with eight pueblo leaders about the opioid abuse problem. The article also states official plan to make educational presentations at two Albuquerque high schools about addiction and opioid abuse. *School events to focus on addiction*, Albuquerque Journal, Sept. 18, 2016, available at

https://www.abqjournal.com/847489/school-events-to-focus-on-addiction.html. *See* Exhibit P.

26. On September 19, 2016, the United States Attorney's Office District of New Mexico released a press statement titled "DOJ Officials and Tribal Leaders to Discuss Impact of Heroin and Opioid Epidemic on New Mexico's Tribal Communities." The press release discusses the New Mexico Heroin and Opioid Prevention and Education (HOPE) Initiative, which is a partnership between UNM Health Sciences Center and the U.S. Attorney's Office. The HOPE Initiative was hosting a series of events in September 2016 and included the participation by Bruce G. Ohr, Associate Deputy Attorney General and Director of DOJ's Organized Crime Drug Enforcement Task Force (OCDETF) Program. On September 20, 2016, triable leaders and police chiefs from the Eight Norther Indian Pueblos met with Associate Deputy Attorney General Ohr and U.S. Attorney Damon P. Martinez at the Indian Pueblo Cultural Center in Albuquerque in order to discuss the "devastating"

impact heroin and opioids have had on the northern New Mexico tribal communities. The note section of the press release states the HOPE Initiative launched in January 2015 in response to the national opioid epidemic and had had a "disproportionately devastating impact on New Mexico. Opioid addiction has taken a toll on public safety, public health and the economic viability of our communities." The HOPE Initiative is working in partnership with the DEA, Bernalillo County Opioid Accountability Initiative, Healing Addition in our Community (HAC), Albuquerque Public Schools and other community stakeholders. The press release follows previous press statements and explains the components and goals of the HOPE Initiative along with participating parties in the partnership. *Media Advisory – DOJ Officials and Tribal Leaders to Discuss Impact of Heroin and Opioid Epidemic on New Mexico's Tribal Communities*, United States Department of Justice, *available at* https://www.justice.gov/usao-nm/pr/media-advisory-doj-officials-and-tribal-leaders-discuss-impact-heroin-and-opioid-epidemic. *See* Exhibit Q.

27. On Monday September 19, 2016, the U.S. Attorney's Office District of New Mexico issued a second press release titled "Albuquerque Community Advocate Participates in National Heroin Opioid Awareness Week Events in Washington, D.C." The press release states that President Obama designated the week of September 19-24, 2016, Prescription Opioid and Heroin Epidemic Awareness Week in order to raise awareness about the public health crisis caused by the growing heroin and opioid epidemic. As part of the national awareness week, National Drug Control Policy Director Michael Botticelli and Agriculture Secretary Tom Vilsack hosted a roundtable conversation in the White House with parents affected by the prescription opioid and heroin epidemic. One of the 14 parents included Lou Duran of Albuquerque who also joined Director Botticelli, Secretary Vilsack and U.S. Attorney General Loretta E. Lynch for a telephonic press conference following the roundtable conversation. The press release stated Ms. Duran lost her 19-year-old son Michael to a heroin overdose in 2011. Ms. Duran's son became addicted after he was prescribed opioids for a sports-related injury and moved on to heroin. Ms. Duran became an advocated in the New Mexico by joining HAC. The press release goes on to state Ms. Duran's friend Jennifer Weiss-Burke, who also lost her son Cameron to a heroin overdose founded HAC and Serenity Mesa, substance abuse treatment center for adolescents and young adults. Ms. Duran and Ms. Weiss-Burke collaborated with the HOPE Initiative since it launched in January 2015. "Ms.

Duran and Ms. Weiss-Burke were part of the inspiration that led the U.S. Attorney to approach Chancellor Paul

B. Roth of the UNM Health Sciences Center about partnering up in the HOPE Initiative. 'Years before the rest

of the country realized that the opioid epidemic was looming, Lou Duran, Jennifer Weiss-Burke and HAC were

using their personal stories to draw attention to this critically important issue.  They understood that the first

step towards defeating this devastating epidemic was to make our communities' aware of its existence and the

devastating impact it was having on all aspects of our society,' said U.S. Attorney Damon P. Martinez.  'The

HOPE Initiative continues to be inspired by Lou, Jennifer and HAC, and we are proud to partner with them on

HOPE's education and prevention efforts.'" *Albuquerque Community Advocate Participates in National Heroin*

*Opioid Awareness Week Events in Washington, D.C*, United States Department of Justice, *available at*

https://www.justice.gov/usao-nm/pr/albuquerque-community-advocate-participates-national-heroin-and-opioid-

awareness-week.  *See* Exhibit R.

28. On September 20, 2016, the Albuquerque Journal published an article titled "Use naloxone to save lives,

police officials urge." The article states Taos County Sheriff Jerry Hogrefe and his deputies began carrying

naloxone which has saved lives by reversing the effect of heroin and opioid overdoses. The article states

Hogrefe joined U.S. Attorney Damon Martinez and 13 law enforcement agencies to enlist more agencies on

training their officers to use naloxone. Dr. Joanna Katzman, director of the University of New Mexico Pain

Center, joined Martinez at the press conference to announce the naloxone project. The article states the project

is part of the HOPE Initiative, which aims to reduce the number of opioid related deaths in the New Mexico

through education, prevention and law enforcement. The article states the HOPE Initiative was formed in 2015

by Martinez's office and the UNM Health Sciences Center curb the heroin and opioid epidemic use in New

Mexico. The article states the announcement is one of several events scheduled for the National Heroin and

Opioid Awareness Week. Oliver Uyttebrouck, *Use naloxone to save lives, police officials urge*, Albuquerque

Journal, Sept. 20, 2016, available at https://www.abqjournal.com/848753/use-naloxone-to-save-lives-police-

officials-urge.html. *See* Exhibit S.

## OCTOBER 2016

29. On October 23, 2016, the Santa Fe New Mexican released an article titled "As overdose deaths mount,

DEA retreats in opioid war." The article discusses the DEA launching an aggressive campaign, over a decade ago, to curb a rising opioid epidemic. The DEA targeted wholesale companies that distributed highly addictive pills to corrupt pharmacies who sold drugs for street use. The DEA faced push back from the drug companies, and, following an unusual meeting between the DEA and the drug companies, the number of enforcement cases plummeted. A DEA supervisor discussed how "things came to a grinding halt" and the number of civil cases and suspension orders dropped. The article states from 2000 to 2014, 165,000 people died from overdoes of prescription painkillers nationwide. The rise of prescription painkiller overdoses also fostered connected epidemics of heroin, which cause nearly 55,000 overdose deaths in the same period. The article discusses the DEA launching a campaign against drug distributors, under the direction of Joseph Rannazzisi, in order to curb the prescription drug addiction epidemic. However, in 2012, a new standard for investigators was established requiring the evidence be beyond a reasonable doubt. The new standard made it very difficult for the DEA to bring a case against prescription drug distributors. Lobbying by the pharmaceutical industry on Capitol Hill resulted in a surrender to the industry, according Joseph Rannazzisi who retired from the DEA in 2015. Lenny Bernstein & Scott Higham, *As overdose deaths mount, DEA retreats in opioid war,* Santa Fe New Mexican, Oct. 23, 2016, available at http://www.santafenewmexican.com/news/as-overdose-deaths-mount-dea-retreats-in-its-war-on/article_1fb88a9e-b039-55ce-a63f-b95cf539f129.html. *See* Exhibit T.

30. During jury selection, the defense respectfully requests the Court to allow for additional time to enquire from each juror whether they are familiar with the government's HOPE initiative, the Bernalillo County Opioid Accountability Initiative, Healing Addiction in our Community (HAC) and other community groups.

## **ARGUMENT**

1. After almost every Albuquerque Journal article, the New Mexico television media (television stations KOB Eyewitness News 4, KRQE News 13, and KOAT-TV 7) often publish stories regarding the article first published in the Albuquerque Journal on television and on social media.

2. At this critical stage of the case, Mr. Moya respectfully and graciously request the Court to immediately prohibit the government and law enforcement, and all lawyers in this case, as well as any persons associated with them, from releasing or authorizing the release of information or opinions about these proceedings, since

20

there is a reasonable likelihood that such disclosure will interfere with a fair trial of the pending charges and/or otherwise prejudice the due administration of justice. *See United States v. Salemme*, 978 F.Supp.386, 386-90 (D. Mass. 1997).

3.   Such a protective order should apply to "all federal, state, and local law enforcement agencies or entities that: formally participated in these criminal investigation . . .; provided to the federal government information that was included in any application or affidavit . . .; or have evaluated or investigated any issues relevant to the pending proceedings" and pertain to all "documents and records produced" and comments thereon.  *Id.*

4.   This Court has the power to enter an order prohibiting extrajudicial statements from not only the parties but law enforcement, too.  "[T]he court has the power to issue an order **restricting** the comments of agents as well as attorneys."  *United States v. Flemmi*, 233 F. Supp.2d at 79-80.

5.   The State of New Mexico prohibits extrajudicial comments by attorneys about pending criminal proceedings that create "a clear and present danger" of prejudicing the proceeding. N.M. R. PROF. CONDUCT, R 16-306.  Rule 16-306 provides:

> **Rule 16-306 Trial Publicity**
>
> **A. Extrajudicial Statements**. A lawyer shall not make any extrajudicial or out-of-forum statement in a proceeding that may be tried to a jury that the lawyer knows or reasonably should know:
>
> (1) is false; or
>
> (2) creates a clear and present danger of prejudicing the proceeding.
>
> **B. Attorney's Obligations With Respect to Other Persons**. A lawyer shall make reasonable efforts to insure compliance with this rule by associated attorneys, employees and members of law enforcement and investigative agencies.

Rule 16-306 NMRA (2008).

6.   In addition, New Mexico attorney ethics rules impose the following special duties on prosecutors:

> **Rule 16-308 Special Responsibilities of a Prosecutor**
>
> The prosecutor in a criminal case shall:
> ....
> F. exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 16-306.

Rule 16-308 NMRA (2015).

7.   The official Comment to New Mexico Rule 16-308 provides:

A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence. Precisely how far the prosecutor is required to go in this direction is a matter of debate and varies in different jurisdictions. Many jurisdictions have adopted the ABA Standards of Criminal Justice Relating to Prosecution Function, which in turn are the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense.   See also American Bar Association ("ABA") Model Rules of Professional Conduct, Rule 3.3(d), governing ex parte proceedings, among which grand jury proceedings are included. Applicable law may require other measures by the prosecutor and knowing disregard of those obligations or a systematic abuse of prosecutorial discretion could constitute a violation of Rule 8.4.

Rule 16-308 NMRA COMMENT (2008).

8.   In addition, American Bar Association (ABA) Model Rules of Professional Conduct, Rule 3.8(f),

provides that, in the rule governing the "Special Responsibilities of a Prosecutor,"

except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose," a prosecutor in a criminal case shall "refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule".

See also Twohig v. Blackmer, 121 N.M. 746, 918 P.2d 332, United States v. Troutman, 814 F.2d 1428 (10th Cir.

1987) (contrast U.S. attorney's brief press statement that was a general comment on the complexity of cases

involving charges against public officials and found to not be a specific comment on the strengths of the present

case or defendant's guilt or innocence, and did not violate).

9.   Where media coverage becomes severe, constitutional violations warranted reversal of convictions may

occur.  In Irvin v. Dowd, the Supreme Court of the United States overturned a conviction and capital sentence

because media coverage was so extensive and prejudicial that an impartial jury could not be obtained.  See 366

U.S. 717 (1961)(superseded by statute 28 U.S.C. § 2254 on other grounds).  The Supreme Court in Irvin

explained: "It cannot be gainsaid that the force of this continued adverse publicity caused a sustained

excitement and fostered a strong prejudice among the people of Gibson County."  Id.  The Court further

detailed:

Here the "pattern of deep and bitter prejudice" shown to be present throughout the community, *cf. Stroble v. California*, 343 U.S. 181, was clearly reflected in the sum total of the voir dire examination of a majority of the jurors finally placed in the jury box. Eight out of the 12 thought petitioner was guilty. With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man.

*Irvin v. Dowd*, 366 U.S. at 727. As a consequence, in *Irvin* the Court held: "Petitioner's detention and sentence of death pursuant to the void judgment is in violation of the Constitution of the United States and he is therefore entitled to be freed therefrom." *Id*. at 728. In a later decision, the Supreme Court distinguished Irvin, but offered particularly instructive analysis regarding the types of cases in which excessive media coverage unfairly prejudice potential juries:

A trial court's findings of juror impartiality may "be overturned only for 'manifest error.'" *Patton v. Yount*, 467 U.S. 1025, 1031, 81 L. Ed. 2d 847, 104 S. Ct. 2885 (1984) (quoting *Irvin v. Dowd*, supra, at 723). In *Patton*, we acknowledged that "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed," 467 U.S. at 1031, but this is not such a case. Had the trial court in this case been confronted with the "wave of public passion" engendered by pretrial publicity that occurred in connection with Irvin's trial, the Due Process Clause of the Fourteenth Amendment might well have required more extensive examination of potential jurors than it undertook here. But the showings are not comparable; the cases differ both in the kind of community in which the coverage took place and in extent of media coverage. Unlike the community involved in *Irvin*, the county in which petitioner was tried, Prince William, had a population in 1988 of 182,537, and this was one of nine murders committed in the county that year. It is a part of the metropolitan Washington statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year. In *Irvin*, news accounts included details of the defendant's confessions to 24 burglaries and six murders, including the one for which he was tried, as well as his unaccepted offer to plead guilty in order to avoid the death sentence. They contained numerous opinions as to his guilt, as well as opinions about the appropriate punishment. While news reports about Mu'Min were not favorable, they did not contain the same sort of damaging information. Much of the pretrial publicity was aimed at the Department of Corrections and the criminal justice system in general, criticizing the furlough and work-release programs that made this and other crimes possible. Any killing that ultimately results in a charge of capital murder will engender considerable media coverage, and this one may have engendered more than most because of its occurrence during the 1988 Presidential campaign, when a similar crime committed by a Massachusetts inmate became a subject of national debate. But, while the pretrial publicity in this case appears to have been substantial, it was not of the same kind or extent as that found to exist in *Irvin*.

*Mu'Min v. Virginia,* 500 U.S. 415, 428-30, 111 S. Ct. 1899, 1907 (1991).

10. The undersigned are not, at this time, challenging the impartiality of a jury, as the petitioners in *Irvin*, *Patton*, and *Mu'Min* were. The Supreme Court was reluctant to find manifest error in *Patton* and *Mu'Min*,

given the difficult burden and the broad discretion that a trial court enjoys with respect to the determination of jury impartiality.  Here, the Defendant brings this motion to prevent the sort of manifest error that could occur, and the relief sought is not drastic.  Defendant is asking that the Court to order the government's attorneys, those under their control, and state and federal law enforcement involved in the case, to refrain from discussing the case with the media and from otherwise leaking information about the case.  Such a protective order may not guarantee that the Defendant will obtain a fair trial with an impartial jury, but it will diminish the role that prosecutors and law enforcement are playing in fomenting sensational media coverage that may taint potential jurors.  It is not yet known whether such efforts are now too little too late, but at least going forward, the government should be required to show more discretion.

11. Mr. Moya is presumed innocent, and is entitled to be tried by an impartial jury.  The steady flow of publicity about this case over the last several months has undoubtedly affected the New Mexico jury pool.  The Defendant questions seriously whether it is now possible for him to receive a fair trial.

12. Other courts have issued orders limiting extrajudicial statements.  The Colorado district court entered an order entitled "Memorandum Opinion and Order Regarding Extrajudicial Statements by Attorneys and Support Personnel," which "articulate[d] the particular standards to be followed in this litigation . . . for future guidance in all forms of extrajudicial statements about [the] litigation."  *United States v. McVeigh*, 157 F.3d 809, 812 (10th Cir. 1998), *citing United States v. McVeigh*, 931 F.Supp. 756, 760 (D.Colo.1996). The order provided:

A. None of the lawyers in this case or any persons associated with them, including any persons with supervisory authority over them, will release or authorize the release of information or opinion about this criminal proceeding which a reasonable person would expect to be disseminated by any means of public communication, if there is a reasonable likelihood that such disclosure will interfere with a fair trial of the pending charges or otherwise prejudice the due administration of justice.

B. This duty to refrain from prejudicial disclosures requires all counsel to take reasonable precautions to prevent all persons who have been or are now participants in or associated with the investigations conducted by the prosecution and defense from making any statements or releasing any documents that are not in the public record and that are reasonably expected to be publicly disseminated which would be likely to materially prejudice the fairness of this criminal proceeding.

*Id.*

13. The Colorado district court also prohibited any extrajudicial statements concerning "[t]he existence or contents of any statements given by the defendants to any law enforcement personnel" and "[t]he performance of any examinations or tests or any defendant's refusal or failure to submit to any examination, or test." *Id.*

14. The United States District Court, District of New Mexico has previously entered a protective order which the United States Court of Appeals for the Tenth Circuit upheld in *United States v. Tijerina*, 412 F.2d 661 (D.NM 1969). Judge Bratton's order articulated:

> This matter coming on for consideration by the Court upon its own Motion, and it appearing to the Court that there is a reasonable likelihood that prejudicial news prior to trial would render more difficult the impaneling of a fair and impartial jury and would tend to prevent a fair trial and that the Court should enter an order seeking to prevent difficulties in these regards: Now, Therefore, IT IS BY THE COURT ORDERED:
>
> 1. This Order is binding on all attorneys, both for the Government and the defense, on each of the defendants, and on each witness for both sides. It shall remain in force during the pendency of this action in this court.
>
> 2. No party covered by this Order shall make or issue any public statement, written or oral, either at a public meeting or occasion or for public reporting or dissemination in any fashion regarding the jury or jurors in this case, prospective or selected, the merits of the case, the evidence, actual or anticipated, the witnesses or rulings of the Court. This Order does not apply to statements made, evidence given, or pleadings filed in this action. Of course, all proceedings in the action are and will continue to be public and matters of public record.
>
> 3. No person covered by this Order shall avoid the effect of it by actions which indirectly, but deliberately bring about a violation of this Order. A copy of this Order shall be served on each party named above immediately upon its entry, and, as each witness is subpoenaed, a copy of this Order shall be served on him with the service of a subpoena.

*Id.*

15. In cases far less sensationalized, courts have imposed such orders to try to safeguard the rights of the accused and the impartiality of the trial process. *See, e.g., KPNX Broadcasting Co. v. AZ Super. Ct.*, 459 U.S. 1302, 1303 (1982) (upholding trial court order prohibiting court personnel, counsel, witnesses, and jurors from speaking to the press in a murder case that generated extensive publicity); *United States v. Brown*, 218 F.3d 415, 418 (5th Cir. 2000) (upholding gag order entered by district court on its own motion prohibiting parties, lawyers and potential witnesses from making "'any extrajudicial statement or interview'" that "'could interfere with a fair trial or prejudice any defendant, the government, or the administration of justice'"); *Dow Jones & Co., Inc. v. Simon*, 842 F.2d 603, 611 (2nd Cir. 1988) (upholding the order barring extrajudicial statements by

government, its representatives or agents, and defendants except for stating the general nature of allegation or defense, information in the public record, or the scheduling or result of any step in the proceedings); *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984) (upholding order prohibiting potential witnesses from making extrajudicial statements relating to the case); *United States v. Bulger,* 2011 U.S. Dist. LEXIS 69009 (D. Mass. 2011) (requiring the United States Attorney to file an affidavit stating what steps, if any, she would take to prevent improper disclosures by law enforcement officers that would threaten defendant's ability to get a fair trial and, therefore, the government's ability to try the charges against him).

16. Trial by an unbiased jury is one of the rights the Sixth Amendment guarantees defendants.  U.S. CONST. Amendment VI; Charles H. Whitebread & Darrell W. Contreras, *Free Press v. Fair Trial: Protecting the Criminal Defendant's Rights in a Highly Publicized Trial by Applying the Sheppard-Mu'Min Remedy,* 69 S. CAL. L. REV. 1587, 1588 (1996).  Chief Justice John Marshall wrote, "The great value of the trial by jury certainly consists in its fairness and impartiality.  Those who most prize the institution, prize it because it furnishes a tribunal which may be expected to be uninfluenced by an undue bias of mind."  *United States v. Burr*, 25 F. Cas. 49, 50 (Va. Cir. Ct. 1807).

17. In both state and federal courts, permitting a biased jury to decide a criminal defendant's fate fundamentally denies the defendant of due process of law.  Matthew D. Bunker, JUSTICE AND THE MEDIA: RECONCILING FAIR TRIALS AND A FREE PRESS, 41 (1997).

18. A high-profile defendant's Sixth Amendment right to a fair trial often depends precariously on averting, mitigating, or escaping a "Media Circus."  *See* Robert S. Stephen, *Prejudicial Publicity Surrounding a Criminal Trial: What a Trial Court Can Do To Ensure a Fair Trial in the Face of a "Media Circus,"* 26 SUFFOLK U. L. REV. 1063, 1063 (1992).

19. In 1966, in *Sheppard v. Maxwell*, the United States Supreme Court stated that the trial court should have proscribed extrajudicial statements by trial participants due to the intense media scrutiny surrounding the case. *Sheppard v. Maxwell*, 384 U.S. 333, 361–63 (1966).  There, Dr. Sam Sheppard, accused of murdering his pregnant wife, was subject to extensive media scrutiny from the beginning of the ordeal.  *See id.* at 338–39. The Court held that the trial court's failure to protect Sheppard from the prejudicial publicity denied him his

right to a fair trial in violation of due process.  *See Sheppard*, 384 U.S. at 335; Charles H. Whitebread, *Selecting Juries in High Profile Criminal Cases*, 2 GREEN BAG 2d 191, 197 (1999).  The Court said that the trial judge could have mitigated pretrial publicity by prohibiting:

> extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters, such as the refusal of Sheppard to submit to interrogation or take any lie detector tests; any statement made by Sheppard to officials; the identity of prospective witnesses or their probable testimony; any belief in guilt or innocence; or like statements concerning the merits of the case.

*Sheppard*, 384 U.S. at 361.

20. Furthermore, the Court asserted that the trial court should have controlled the release of information to the media.  *See id.* at 361–62. The Court stated that it would permit a trial judge an array of arsenals to prevent trial participants from frustrating the proper functioning of court proceedings in circumstances where pretrial publicity would threaten a defendant's constitutional right to a fair trial.  *See id.* at 361.

21. "Media Circus" trials are notoriously hard to manage without threatening a fair trial, even in the absence of strategic leaks by one side.  *See* Jeffrey S. Johnson, Comment, *The Entertainment Value of a Trial: How Media Access to the Courtroom Is Changing the American Judicial Process*, 10 VILL. SPORTS & ENTERTAINMENT L. J. 131 (2003); Richard Gabriel, *"This Case Is Brought to You By . . . :" How High-Profile Media Trials Affect Juries*, 33 LOY. L.A. L. REV. 725 (2000).

22. While gagging the media is problematic for many reasons, not the least of which is the First Amendment, controlling the flow of information outside of court from the litigants is one tool.  *See* Mawiyah Hooker & Elizabeth Lange, *Limiting Extrajudicial Speech in High-Profile Cases: The Duty of the Prosecutor and Defense Attorney in Their Pre-Trial Communications with the Media*, 16 GEO. J. LEGAL ETHICS 655 (2003); Patricia J. Falk, *Introduction, Toward More Reliable Jury Verdicts?: Law, Technology, and Media Developments Since the Trials of Dr. Sam Sheppard*, 49 CLEV. ST. L. REV. 385 (2001).

23. The Defendant does not seek to restrain the press; he seeks only to impose reasonable and ethical limits on the press to obtain a fair trial.  A constitutionally sound trial is the Defendant's goal.  Many members of the legal community have written on the impact of the media on criminal cases, and the consequences of media saturation of the case.  *See* John A. Walton, *Struck by the Falling Bullet: The Continuing Need for Definitive*

*Standards in Media Coverage of Criminal Proceedings*, 49 CLEV. ST. L. REV. 407 (2001) ("In its opinion in the *Sheppard* case, the Supreme Court suggested strict guidelines and limits for the media with respect to criminal case coverage.  Those limits have never materialized.  Instead, the obligation to set those limits resides with lawyers, judges, police, and the media.  Our obligation is to remember that our standards protect the system, the system protects victims, and suspects and our errors are not truly erased by reversals.").  *See also* Laurie Levenson, *Witness to History: The Role of Legal Commentators in High Profile Trials*, 49 CLEV. ST. L. REV. 439 (2001) ("The media has an important role, but it's not easy.  As was described earlier, the First Amendment rights of the media are continuously balanced against the defendant's right to a fair trial.  And that balance can work—if we take it seriously."); Joan Gladstone, *Trial by Media, Managing News Coverage of Your Case, Your Client, and Yourself*, 43-SEP OC LAW 22 (2001) ("Interacting with the media is a volatile and high-risk exercise with potent consequences if mismanaged.  Media attention that is premature and negative in content can harm your clients, your case and even you."); Gerald T. Wetherington, Hanson Lawton, & Donald I. Pollock, *Preparing for the High Profile Case: An Omnibus Treatment for Judges and Lawyers*, 51 FLA. L. REV. 425 (1999) ("In some cases gag orders are difficult to enforce and may not stem the flow of prejudicial information from the media.  In such cases, the court should consider attempting to get the parties to voluntarily limit extrajudicial comments.  When possible, the issuing court should specifically delineate the topics forbidden by the gag order, and also consider establishing a process to permit the restrained party to obtain a court ruling determining whether a particular statement is prejudicial.")

24. By definition, providing information to media in a high-profile case taints the potential jury pool.  *See* Laurie Nicole Robinson, *Note, Professional Athletes—Held to a Higher Standard and Above the Law: A Comment on High-Profile Criminal Defendants and the Need for States to Establish High-Profile Courts*, 73 IND. L.J. 1313, 1313 (1998) (Theorizing that the public's interest in high-profile criminal cases has grown dramatically over the last decade, increasing the difficulty of finding impartial decision makers.  Because such a highly publicized atmosphere surrounds potential jurors, these triers of fact may be influenced as to the guilt or innocence of a high-profile defendant before the trial even begins.)

25. During jury selection, the defense respectfully requests the Court to allow for additional time to enquire

from each juror whether they are familiar with, (1) this case through the media articles, (2) the government's HOPE initiative, (3) the Bernalillo County Opioid Accountability Initiative, (4) Healing Addiction in our Community (HAC) and other relevant community groups, that has been publicized in print, news and social media.  *See United States v. Chanthadara*, 230 F.3d 1237, 1264 (10th Cir. 2000) (a court determining "whether the court's failure to specifically voir dire the jury regarding exposure to prejudicial publicity denied a defendant the right to a fair trial," generally considers "whether (1) the nature of the news material is innately prejudicial and (2) the material is likely to have reached the jury."); *see also Harlow v. Murphy*, No. 05-CV-039-B, 2008 U.S. Dist. LEXIS 124288, at *211 (D. Wyo. Jan. 15, 2008) (concluding that the defendant's proposed voir dire into jury's exposure to pretrial publicity, and the resulting prejudice, was constitutionally required).

WHEREFORE, the Defendant respectfully requests that this Court enter a Protective Order forbidding the parties in this case from making extrajudicial disclosures of information, statements, documents and photographs unless and until such disclosure is reviewed in an adversarial proceeding and ruled acceptable by the Court.  The Defendant requests that this Protective Order extend to not only the United States Attorney's Office but to all involved potential witnesses, law enforcement agents, and staff to afford Mr. Moya a fair jury trial.

Respectfully Submitted,

/s *electronically submitted*
JD Herrera
Law Offices of JD Herrera
620 Roma Avenue NW
Albuquerque, NM 87102
(505) 262-1003
jd@jdherreralaw.com


/s *electronically submitted*
Amy Sirignano
5901J Wyoming Blvd. NE #250
Albuquerque, NM 87109
(505) 242-2770
amy@abqnmlaw.com

Counsel for Raymond Moya

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was sent via
the Court's CM/ECF system to counsel for the government
AUSA Sean Sullivan, and AUSA Nick Ganjei, this 13th
day of December 2016.

/s  <u>*electronically submitted*</u>
Amy Sirignano, Esq.